1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT

8

FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11

12

13

14

15

16

| | |
|---|---|
| DOUGLAS VERNELL JACKSON,<br><br>                              Petitioner,<br><br>        v.<br><br><br>E. VALENZUELA, Warden,<br><br>                              Respondent. | **Case No. 1:13-cv-01296 LJO MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

17

18        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

19 corpus pursuant to 28 U.S.C. § 2254.  Respondent is represented by William K. Kim of

20 the office of the Attorney General.

21 **I.        PROCEDURAL BACKGROUND**

22        Petitioner is currently in the custody of the California Department of Corrections

23 pursuant to a judgment of the Superior Court of California, County of Fresno, following

24 his conviction by jury trial on December 1, 2008, for attempted robbery, attempted

25 murder of a peace officer, assault with a firearm upon a peace officer, evading a police

26 officer, and felon in possession of a firearm. (Clerk's Tr. at 605-608.)  Petitioner was

27 sentenced to an indeterminate sentence of forty-eight (48) years to life in state prison.

28 (Id.)

1    Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

2  District, which affirmed the judgment on November 7, 2011.  (Answer, ECF No. 29, Ex.

3  A.)  On January 25, 2012, the California Supreme Court denied review.  (Lodged Doc.

4  5.)

5    Petitioner filed a petition for writ of habeas corpus with the Fresno County

6  Superior Court on February 21, 2013. (Lodged Doc. 6.) The Court denied the petition on

7  April 5, 2013. (Lodged Doc. 7.)

8    Petitioner filed the instant federal habeas petition on August 7, 2013.  (Pet., ECF

9  No. 1 at 1.) Petitioner presents four claims for relief in the instant petition.  Petitioner

10  alleges that (1) his due process rights were violated by an unduly suggestive

11  identification procedure where witnesses had seen Petitioner's picture in the newspaper

12  days before the identification; (2) he was denied the right to a fair trial by an impartial jury

13  because of the trial court's failure to conduct a further inquiry into juror intimidation; (3)

14  the trial court's refusal to grant a mistrial on the grounds of juror misconduct; and (4) the

15  trial court's error in allowing "a significant number of Clovis Police Officers" in the

16  courtroom while playing exhibits for the jurors. (Id.)

17    Respondent filed an answer on May 9, 2014, and Petitioner filed a traverse on

18  June 6, 2014. (ECF Nos. 29, 31.) The matter stands ready for adjudication.

19  **II.    STATEMENT OF THE FACTS**[1]

20    On August 5, 2006, [Petitioner] robbed a bank in Fresno. On
21    August 29, 2006, he and Jamal Justin Chambers attempted to rob
      a bank in Clovis but, after finding out no one could open the vault,
      fled empty-handed and shot at officers during an ensuing police
22    pursuit.

23   (Answer, Ex. A at 1.)

24  **III.    DISCUSSION**

25    **A.    Jurisdiction**

26

27  [1]The Fifth District Court of Appeal's summary of the facts in its November 7, 2011 opinion is presumed
    correct.  28 U.S.C. § 2254(e)(1).

28

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  (Pet.)   In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a).  Accordingly, this Court has jurisdiction over the instant action.

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by AEDPA provisions.

Under AEDPA, a person in custody under a judgment of a state court may only be granted a writ of habeas corpus for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### 1.    Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that [are] materially indistinguishable from [a Supreme Court case] but reaches a

1  different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at

2  405-06).   "AEDPA does not require state and federal courts to wait for some nearly

3  identical factual pattern before a legal rule must be applied . . . The statute recognizes . .

4  . that even a general standard may be applied in an unreasonable manner." <u>Panetti v.</u>

5  <u>Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).   The

6  "clearly established Federal law" requirement "does not demand more than a 'principle'

7  or 'general standard.'" <u>Musladin v. Lamarque</u>, 555 F.3d 830, 839 (2009).  For a state

8  decision to be an unreasonable application of clearly established federal law under §

9  2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

10  (or principles) to the issue before the state court. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-

11  71 (2003).  A state court decision will involve an "unreasonable application of" federal

12  law only if it is "objectively unreasonable." <u>Id.</u> at 75-76 (quoting <u>Williams</u>, 529 U.S. at

13  409-10); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002).  In <u>Harrington v. Richter</u>, the

14  Court further stresses that "an *unreasonable* application of federal law is different from

15  an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011) (citing <u>Williams</u>, 529

16  U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

17  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

18  correctness of the state court's decision." <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541

19  U.S. 653, 664 (2004)).   Further, "[t]he more general the rule, the more leeway courts

20  have in reading outcomes in case-by-case determinations." <u>Id.</u>; <u>Renico v. Lett</u>, 130 S.

21  Ct. 1855, 1864 (2010).   "It is not an unreasonable application of clearly established

22  Federal law for a state court to decline to apply a specific legal rule that has not been

23  squarely established by this Court." <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419

24  (2009) (quoted by <u>Richter</u>, 131 S. Ct. at 786).

                2.      <u>Review of State Decisions</u>

26       "Where there has been one reasoned state judgment rejecting a federal claim,

27  later unexplained orders upholding that judgment or rejecting the claim rest on the same

28  grounds." <u>See Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the

"look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006).   Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion, "does not require that there be an opinion from the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  Id.  "This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Id.

Richter instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents."  Id. (emphasis added).  To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts are the principal forum for asserting constitutional challenges to state convictions."  Id. at 787.  It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings."  Id.

1 (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977)).

2                              3.      <u>Prejudicial Impact of Constitutional Error</u>

3        The prejudicial impact of any constitutional error is assessed by asking whether

4 the error had "a substantial and injurious effect or influence in determining the jury's

5 verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551

6 U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the

7 state court recognized the error and reviewed it for harmlessness).  Some constitutional

8 errors, however, do not require that the petitioner demonstrate prejudice.  <u>See</u> <u>Arizona v.</u>

9 <u>Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659

10 (1984).

11 **IV.    <u>REVIEW OF PETITION</u>**

12        **A.    <u>Claim One: Unduly Suggestive or Unreliable Identification</u>**

13        Petitioner, in his first claim, asserts that his due process rights were violated by

14 the actions of law enforcement in relying upon unduly suggestive identification

15 techniques that rendered the witnesses identification of Petitioner as unreliable.

16                              1.      <u>State Court Decision</u>

17        Petitioner presented his claim by way of direct appeal to the California Court of

18 Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

19 Court of Appeal (Answer, Ex. A.) and in a subsequent appeal to the California Supreme

20 Court (Lodged Doc. 5.). "[W]here there has been one reasoned state judgment rejecting

21 a federal claim, later unexplained orders upholding that judgment or rejecting the claim

22 rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is

23 referred to as the "look through" presumption.  <u>Id.</u> at 804.  Since the Court of Appeal was

24 the last court to issue a reasoned opinion on this issue, this Court "looks through" the

25 California Supreme Court decision to the reasoned analysis of the Court of Appeal.  With

26 regard to the unreliable identification technique claim, the Court of Appeal said in its

27 opinion:

28        1. Identification as Perpetrator of Fresno Bank Robbery

1
2
3

Jackson argues that "the identification process was so unduly suggestive and unreliable" as to require reversal of his conviction of the Fresno bank robbery. The Attorney General argues that he fails to show "as a demonstrable reality, not just speculation," that the identification process was not fair.

4
5
6
7
8
9
10
11
12

The crux of Jackson's argument is that his conviction of the bank robbery in Fresno "was obtained using an identification process in which [the operations manager], and possibly [a teller], identified [him] as the perpetrator only after seeing his photograph in the newspaper as the suspect" of the crimes that arose from the attempted Clovis bank robbery on August 29, 2006. A detective who noticed a similarity between the suspects in the two crimes showed a photo lineup to the teller on that date. On the basis of her observation of the robber's face at the bank, she identified Jackson. Only afterward did she see any photos of suspects in the newspaper. None had yet been publicized. On August 31, 2006, he showed the operations manager a photo lineup with a photo of Jackson that was different from the one she saw in the newspaper. He told her, "When you're looking at these photographs, I want you to think about the day of the robbery and the person that you saw come into the bank." On the basis of her "interaction with the individual" at the bank and the "still video photo" from the bank, she identified Jackson.

13
14
15
16
17
18
19
20
21
22

The parties agree on the governing law. With reference to "the relationship between suggestiveness and misidentification," the United States Supreme Court holds, "It is the likelihood of misidentification which violates a defendant's right to due process." (Neil v. Biggers (1972) 409 U.S. 188, 198.) Citing Biggers, our Supreme Court notes that the relevant considerations on whether the admission of identification evidence violates due process are "(1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (People v. Cunningham (2001) 25 Cal.4th 926, 989, citing, e.g., Biggers, supra, at pp. 199-200.) On the issue of "whether a pretrial identification procedure was unduly suggestive," our Supreme Court holds that "the standard of independent review applies." (People v. Kennedy (2005) 36 Cal.4th 595, 609, overruled on another ground by People v. Williams (2010) 49 Cal.4th 405, 459.)

23
24
25
26
27

The parties disagree, however, on the outcome of an application of the governing law to the facts before us. Jackson argues that the operations manager, having seen his photo in the newspaper and having acknowledged paying closer attention to the robber who was holding the handgun than to him, made a flawed identification. He argues that the teller's equivocation about whether he was wearing sunglasses and the lapse of time between the robbery and the photo lineup made her identification troublesome as well.

28

The Attorney General, on the other hand, emphasizes that the detective did not show Jackson's photo from the newspaper to the

1   operations manager, who identified him on the basis of her interaction with
2   the robber at the bank and the robber's photo from the bank's security
    system. Even a questionable identification, if based on factors other than
3   impermissibly suggestive procedures, is an issue of credibility properly
    decided by a jury. (<u>People v. Contreras</u> (1993) 17 Cal.App.4th 813, 822-
4   823.) Any risk of misidentification of Jackson by the operations manager
    or the teller was "substantially lessened by a course of cross-examination
5   at trial." (<u>Simmons v. United States</u> (1968) 390 U.S. 377, 384.) By the
    standard of independent review, he fails to persuade us that the
    identification process here was so suggestive as to require reversal.

6   <u>People v. Jackson</u>, 2011 Cal. App. Unpub. LEXIS 8520, 5-9 (Cal. App. 5th Dist., Nov. 7,
7   2011).

8           **C.    <u>Analysis</u>**

9           The Supreme Court has recently emphasized in a case involving an allegedly

10  suggestive pretrial identification that "[t]he Constitution, our decisions indicate, protects a

11  defendant against a conviction based on evidence of questionable reliability, not by

12  prohibiting introduction of the evidence, but by affording the defendant means to

13  persuade the jury that the evidence should be discounted as unworthy of credit." <u>Perry v.</u>

14  <u>New Hampshire</u>,      U.S.    ,    , 132 S. Ct. 716, 723, 181 L. Ed. 2d 694 (2012). Aside

15  from the Sixth Amendment rights to counsel, compulsory process, examination of

16  witnesses, and confrontation/cross-examination, "state and federal statutes and rules

17  ordinarily govern the admissibility of evidence, and juries are assigned the task of

18  determining the reliability of the evidence presented at trial." <u>Id.</u> Consequently, a trial

19  court's admission of evidence violates due process only when the evidence "is so

20  extremely unfair that its admission violates fundamental conceptions of justice." <u>Id.</u>

21  (quoting <u>Dowling v. United States</u>, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708

22  (1990)).

23          Consistent with these principles, "[w]hen a witness identifies the defendant in a

24  police-organized photo lineup, . . . the identification should be suppressed only where

25  'the photographic identification procedure was so [unnecessarily] suggestive as to give

26  rise to a very substantial likelihood of irreparable misidentification.'" <u>Id.</u> at 724 (brackets

27  in original) (quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384-85, 88 S. Ct. 967, 19

28  L. Ed. 2d 1247 (1968)).

1      To determine if an identification procedure was unduly suggestive, the court must
2  examine the totality of the surrounding circumstances. United States v. Carr, 761 F.3d
3  1068, 1074 (9th Cir. 2014) (citing United States v. Bagley, 772 F.2d 482, 492 (9th Cir.
4  1985). For example, "[p]hotographic procedures which emphasize the focus upon a
5  single individual increase the danger of misidentification." Bagley, 772 F.2d at 493; see
6  also Simmons, 390 U.S. at 383 ("[The danger of an incorrect identification] will be
7  increased if the police display to the witness only the picture of a single individual who
8  generally resembles the person he saw, or if they show him the pictures of several
9  persons among which the photograph of a single such individual recurs or is in some
10  way emphasized.").

11      Here, Petitioner has not established that the identification procedure presented to
12  the witnesses was suggestive or that the witnesses' identifications were overly
13  unreliable. First, Petitioner has not claimed that the photo lineup presented to the
14  witnesses emphasized his photo or caused him to stand out in any way. See Bagley,
15  772 F.2d at 493. Nor has Petitioner claimed that the law enforcement officers that
16  administered the lineups used coercive techniques in an attempt to have the witnesses
17  identify Petitioner.

18      With regard to the teller, Ray Ana Perez, Petitioner claims that her identification
19  was unreliable based on the fact that stress and fear can distort perception, and that she
20  was distracted and focused on the gun during the robbery. (Pet. at 16.) During trial Perez
21  testified that she was provided the lineup prior to seeing any other photos of Petitioner,
22  including newspaper articles regarding the robbery. (Rep. Tr. at 1544, 1548-49.) Perez
23  admitted that she was not able to see Petitioner's eyes during the robbery because he
24  was wearing sunglasses. (Id. at 1548.) While Perez's view of the robber's face was
25  obscured by sunglasses, her ability to observe the robber's face was a factor for the jury
26  to take into account in determining the reliability of her testimony. Further, her ability to
27  observe the robber does not implicate that the identification techniques were suggestive.
28  Based the evidence presented at trial, Petitioner has not shown that the identification

1   procedure was unduly suggestive.

2          Petitioner's arguments erroneously focus on the second step in the analysis,

3   involving whether under the totality of the circumstances, under the five factors

4   articulated in Biggers, the witness's identification was reliable. See Manson, 432 U.S. at

5   114; see also Biggers, 409 U.S. at 199-200. But, those factors are analyzed where the

6   challenged pretrial identification procedure is first found to be impermissibly suggestive.

7   If the procedure was not impermissibly suggestive, and it was not here, the due process

8   inquiry ends. See Perry, 132 S. Ct. at 724 ("[D]ue process concerns arise only when law

9   enforcement officers use an identification procedure that is both suggestive and

10  unnecessary."); see also Bagley, 772 F.2d at 492 ("If we find that a challenged

11  procedure is not impermissibly suggestive, our inquiry into the due process claim

12  ends."). The Court notes that while stress and fear might distort a witness' memory or

13  perception, Petitioner has not presented any evidence in this case that Perez's

14  identification suffered from irreparable unreliability. Regardless, Petitioner has not shown

15  that the state court's review of his federal due process claim regarding the bank teller's

16  identification was unreasonable.

17         With regard to the identification of Petitioner by Deborah Patterson, the bank

18  manager, she noted that she had read a news article which included a photograph of

19  Petitioner in the newspaper prior to her identification. (Rep. Tr. 1365.) As the state court

20  noted in its decision, the source of the potential unreliability of the witness' identification

21  was the publication of Petitioner's photo in the newspaper, not actions on behalf of law

22  enforcement making the lineup unduly suggestive. Despite Petitioner's attempts to limit

23  such testimony, the Supreme Court specifically explained that the situation presented

24  does not violate Petitioner's due process rights. See, Perry, 132 S. Ct. at 727-728 ("Most

25  eyewitness identifications involve some element of suggestion. Indeed, all in-court

26  identifications do. Out-of-court identifications volunteered by witnesses are also likely to

27  involve suggestive circumstances. For example, suppose a witness identifies the

28  defendant to police officers after seeing a photograph of the defendant in the press

1   captioned "theft suspect," or hearing a radio report implicating the defendant in the

2   crime."). Rather Petitioner must rely upon other procedural safeguards, such as jury

3   instructions regarding limitations on reliability of witness identifications, and on the cross-

4   examination of the witness by defense counsel.) (Id. at 729-30.) Petitioner has not

5   shown that such safeguards were not in place. The trial court instructed the jury

6   regarding factors that influence the reliability of eyewitness testimony. (Rep. Tr. at 3940-

7   41.) Finally, Petitioner has not shown that he lacked the opportunity to cross-examine

8   the witness or present arguments at closing challenging the reliability of the witness'

9   identification.

10      For the foregoing reasons, Petitioner is not entitled to federal habeas relief for his

11  challenge to the witnesses' pretrial photographic identification of him as the bank robber.

12  Specifically, he has failed to satisfy the "unreasonable application" prong of § 2254(d)(1)

13  by showing that there  was no reasonable basis for the state courts' denial of that claim.

14  Pinholster, 131 S. Ct. at 1402. Petitioner is not entitled to habeas relief with regard to

15  claim one.

16  **B.      Claims Two through Four: Intimidation of and Prejudgment of the**

17  **Case by Jurors**

18      Petitioner contends that he was deprived of the right to a fair trial and an impartial

19  jury because the court failed to adequately investigate the possible intimidation of jurors

20  and the possibility that jurors had prejudged the case.  (Pet. at 15-20.) The Court shall

21  address each claim in turn.

22              1.      State Court Decision

23      Petitioner presented his claims by way of direct appeal to the California Court of

24  Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the

25  Court of Appeal (Answer, Ex. A.) and in a subsequent appeal to the California Supreme

26  Court (Lodged Doc. 5.) As stated earlier, "where there has been one reasoned state

27  judgment rejecting a federal claim, later unexplained orders upholding that judgment or

28  rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797,

803 (1991).  This is referred to as the "look through" presumption.  Id. at 804.  Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.  With regard to the jury intimidation claims, the Court of Appeal said in its opinion:

### 1. Claim of Juror Intimidation During Testimony

Jackson argues that the court's failure to conduct an adequate inquiry into possible juror intimidation by spectators violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.

On the 11th day of trial, juror number 3 submitted a letter to the court expressing "concern" about two men in the courtroom who made Jackson's former girlfriend "very nervous" as she testified. The letter referred to a comment about "Lo Boys" in Jackson's fiancé's testimony and to a comment overheard during a break about how the two men were Jackson's cousins. The letter mentioned that several jurors had to step around the two men in the hall. Juror number 3 said she was no "stranger to the Lo Boys and their reputation: but admitted she was not "very comfortable" about their presence and thought other jurors might "feel the same." She wrote, "Please give me the assurance that I will be safe here and there will not be any intimidation from visitors in the courtroom."

In chambers, the court and counsel conferred with juror number 3, who said that other jurors made comments about how the two men made the witness nervous. Hearing Jackson's fiancé refer on stand to Jackson as "Chain or Shane," which "was his Lo[] Boy name." "freaked [her] out a little bit," after which she took off her juror badge. She reported that juror number 5 mentioned leaving her wedding ring at home and feeling nervous about walking to her car. Later, juror number 3 acknowledged "I don't know if I heard Lo[] Boy or not." The court asked, "Has anybody done anything that in any way obviously or subjectively, made you feel personally intimidated?" She answered, "No," adding that she "just…felt uneasy." The court asked, "And you were uneasy because?" She answered, "They were just right there." The court asked, "But they did not look at you? Threaten?" She said, "No." The court asked, "Mouth comments?" She answered, "Absolutely not, no." The court noted that "things like that" are "not unusual for a jury trial. You may have a courtroom full of people on both sides." She said she knew about Fresno gangs only because her "spouse worked for a criminal defense attorney for years." The court asked if any of the jurors mentioned the Lo Boys. She said, "No." Asked if she had formed an opinion about guilt or innocence, she replied, "No." To the question, "And is there anything about what you've heard, seen, or observed inside or outside the courtroom that would impact your ability to be fair and impartial?," she likewise replied, "No."

The court called juror number 5 into chambers and told that her [sic] someone had mentioned she was not wearing her wedding ring because she was nervous. She was just "kidding around," she said. Her wedding

ring no longer fits because she gained weight after having her baby. "Anything about any of the local characters or anything else?," the court probed. "Oh, no," she replied, adding that she just gets "nervous around people" and walks "everywhere" in groups.

Out of the presence of juror number 5, the defense asked the court to question the jurors. The court declined the request, noting that it was "extremely reticent to engage in questions of a jury, either before or during deliberations," about the "subjective analysis of the evidence," which included asking jurors about how to analyze "the testimony of a particular witness." The court observed too, that "to carry it further would create actual potential issues that are not present." The court pointed out that the jury was to receive instruction not to consider for any purpose anything that was not evidence, including the activities of others in the courtroom. The court asked the court reporter "what she wrote down" about a possible witness reference to "Lo Boys."

After the noon recess that day, the court, in the presence of counsel and juror number 3 but outside the presence of the rest of the jury, had the court reporter read the portion of Jackson's former girlfriend's testimony that juror number 3 mistakenly thought referred to the Lo Boys. "The testimony was," the court reporter read, "'Chain, like chain?'" and the answer, she read, was, "'No. It is like an old cowboy movie, a long time ago. And his name was Chain, and that's his name they gave him as a little boy.'"

"The decision whether to investigate possible juror bias, incompetence, or misconduct, as well as the ultimate decision whether to retain or discharge a juror, rests within the sounds discretion of the trial court. [Citation.] If any substantial evidence to support the trial court's exercise of its discretion, the court's action will be upheld on appeal." (*People v. Maury* (2003) 30 Cal.4th 342, 434.) As our Supreme Court notes, "a hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a d juror's ability to perform his [or her] duties and would justify his [or her] removal from the case." (*people v. Ray* (1996) 13 Cal.4th 313, 343.)

Here, by questioning juror number 3 at length, questioning juror number 5 briefly, and having the court reporter read back part of Jackson's former girlfriend's testimony, the court found that juror number 3 was mistaken in her recollection that the witness said "Lo Boy" (when, in fact, she said cowboy") and that juror number 5's comment about not wearing her wedding ring because she was nervous was only a joke. [Petitioner] agrees the court resolved juror number 3's initial concern but argues that the discussion of the case by the jurors violated section 1122 and that the court should have conducted a further inquiry. [**FN5**]

> **FN5.** In Part, section 1122 provides, "(a) After the jury has been sworn . . . the court shall instruct the jury generally concerning its basic functions, duties, and conduct. The instructions shall include, among other matters, admonitions that the jurors shall not converse among themselves, or with anyone else, on any subject connected with the trial; . . . and that they shall promptly report to the court any incident within their knowledge involving an attempt by any person to improperly influence any member of the jury. (b) The jury

13

shall also, at each adjournment of the court before the submission of the cause to the jury, whether permitted to separate or kept in charge of officers, be admonished by the court that it is their duty not to converse among themselves, of with anyone else, on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." (§ 1122.)

The Attorney General argues that the juror comments at issue here, though a breach of the court's section 1122 admonitions, showed no prejudgment of the case. We agree. "Trivial violations that do not prejudice the parties do not require removal of a sitting juror." (*People v. Wilson* (2008) 44 Cal.4th 758, 839 (*Wilson*).) The comments here neither suggest prejudgment of guilt nor cast doubt on the impartiality of the jurors or the fairness of the trial. Juror comments like those are "'certainly not as serious as questions designed to obtain extrinsic evidence regarding the case itself.'" (*Ibid.*) "No trials are perfect –evidentiary or procedural errors are bound to occur." (*People v. Garcia* (2005) 36 Cal.4th 777, 808 (conc. & dis. opn. of Chin, J.).) [Petitioner] fails to persuade us that the court should have conducted further inquiry.

### 2. Claim of Juror Prejudgment of Case

Jackson argues that the court's denial of his motion for a mistrial on the ground that jurors prejudged the case violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.

On the 17th day of trial, juror number 1 submitted a note to the court stating, "A comment was made this week that the prosecutor has not done his job so there's no need for a long defense. I am concerned that an attempt was made to taint the jury." Once the court brought her into chambers, she elaborated, "And in my mind I thought why would she say something like that. We are not supposed to make a decision at all until we have heard both sides." She identified the juror who made the comment as juror number 5 and said that juror number 10 responded with something like "yeah, right" but said she did not know whether he was agreeing or being facetious because "those two kind of buddy up with each other" She said, "I heard it, and I just let it go," but agreed to write the note after some other jurors at lunch said the court should be informed.

After juror number 1 left, the court brought juror number 5 into chambers and asked her about her comment. She said some jurors said things like "they're guilty" and "DNA doesn't lie" and that afterward she said "the DA hasn't done his job yet." She denied saying "there's no need for a long defense." She might have said the "defense is not getting that much longer because [she] heard it's only a few days or a week for [the] defense."

After juror number 5 left, the court brought juror number 10 into chambers and asked him about his "yeah, or right, or something" comment in response to the comment juror number 5 made. Juror number 10 said he did not recall making that statement but did say "there has been a lot of talking of everybody in there about the case." Asked by the court to elaborate, he said everyone was "giving some point of view or input about how they feel about the case, but not into specific of guilty verdict or no[t] guilty verdict." For example, "that witness didn't help anybody or things like

that." He said that he had his "own belief of things that may have happened or may not have happened" but still did not "have a completed verdict of not guilty or guilty." Although he was "leaning towards one way," he said he was "still being very fair."

After juror number 10 left, the defense made a motion to interview each juror and made a motion for a mistrial. The prosecutor made a motion to dismiss juror number 5. The court granted the motion to interview each juror – individually, in chambers, in the presence of counsel, and out of the presence of the defendants – and deferred rulings on the other motions.

The court asked juror number 2 if he had heard anything "that has troubled you about anyone having the ability to have a fair trial either side, prosecution, or defense." He said most of the comments were "trivial" like "that witness was funny" and "more like kind of killing time." He said that "everyone has been really careful" not to talk "about the case itself or the evidence or like the believability of the witnesses or the lawyers." The "one comment" he had heard "over the last two weeks that shouldn't have been made" was "the problematic one" by juror number 5 about "they don't need to do anything because the DA hasn't shown enough or something like that." He said "nothing at all" had happened to make him other than a fair and impartial juror.

The court asked juror number 3 if "any conversations or comments" had led her to believe she "could not be fair and impartial." She replied, "No." Other than flip remarks jurors made to get to know each other, the only comment she thought was inappropriate was juror number 5's comment that "the prosecution's not doing their job," a comment that made her think, "when we go into deliberations, she might be a problem." That was the only time "anybody has said anything" that led her to believe "that maybe an opinion had already been formed. And that's why I thought it was out of line."

The court asked juror number 4 if she had heard anything, "just listening to other jurors, that they've made inappropriate statements or have formed opinions about the case that would make them less than impartial." He replied, "No," and said he had not "heard anybody saying anything about the case at all."

The court asked juror number 6 if he had "heard anything from anyone" that would lead him to believe "somebody has made up their mind, not made up their mind, not listening, not following the [] rules." He replied, "No," adding he talks to few people and keeps to himself. Asked by the court if "some discussion, apparently somebody was in the courtroom," that led to "an interchange or something," gave him "any pause for concern" about "being fair and impartial or intimidated or anything like that," he replied, "No, it probably won't be." Asked by the court if he had "heard anyone speak about like they've made up their mind or something like that," he shook his head.

The court asked juror number 7 if there had been any conversations that would lead her "to think that any jurors made up their mind or are speaking inappropriately about things they shouldn't be speaking about." There had been "comments practically by everybody," she replied, not "about the case" or "anything to do with innocent, guilty," but about things like how one of the witnesses "should have zipped up her jacket. Just things like

that."

The court asked juror number 8 if he had heard "any comments about this case from jurors that gave [him] any pause for concern." Replying in the affirmative, he said that a juror made a comment about how "the defense didn't need much time because the prosecution case was so weak." Her comment bothered him. "She shouldn't be saying anything like that one way or the other." He said that nobody made a comment to her at the time but that there was some discussion afterward. "She laughs all the time," he said, and "doesn't seem to be taking this very seriously like a lot of us."

The court asked juror number 9 if he had heard anyone make "comments that they shouldn't have made" that would lead him to think "maybe they formed an opinion." He said he had not "really been talking with the other jurors," had "just been paying attention to the trial," and had not "heard anything actually." Asked by the court if anything had "happened that would give [him] any cause to think [he] could not continue to be fair and impartial," he replied, "No, nothing."

The court asked juror number 11 if she had heard "any comments about this case from anybody, anything from any of [her] fellow jurors that gives [her] any pause." [**FN6**] She replied, "No," adding that she had heard some comments but "nothing trying to persuade anyone." Nothing came to mind that would cause her to think she could not be fair and impartial.

> **FN6.**   By stipulation, the court previously had excused original juror number 11 for hardship and had seated original alternate juror 2 as new juror number 11.

The court asked juror number 12 if he had heard "anything, any comments by any juror that would give [him] any pause for concern about being fair and impartial." He replied, "No."

The court asked juror number 3 if she had heard "any comments by any juror that would give [her] pause for concern." She replied, "Yes." Asked for details, she said that after one of the jurors said the defense was "only going to be a day" juror number 5 said "something to the effect we don't even need a defense because the prosecution didn't do their job." She added, "And it was kind of quiet after that. Everybody looked at each other." That was the first time anyone said something "that should not have been said."

At that juncture, the court, having interviewed each juror individually, brought juror number 5 back into chambers to "follow-up on a couple of things." Asked by the court about the DNA comment, she said she remembered "someone saying DNA doesn't lie." She said she was "not sure" if that person "said we might as well vote guilty" but that is "what [she] got from that." She had "the feeling that people are choosing sides already." Asked by the court if she had chosen sides, she replied, "Honestly, I haven't." She said she had a feeling "a few jurors don't like [her]" because she is "blunt" and "outspoken" but she insisted she could "listen to everybody" during deliberations.

Back in the courtroom, the court admonished all of the jurors together not to "talk about the case or about any of the people or any subject involved in the case" until "after the evidence has been presented, the attorneys

16

have completed their arguments," the court has instructed on the law, and deliberations have begun. The court the excused the jury for the day, denied the defense motion for a mistrial, and denied the prosecutor's motion to dismiss juror number 5.

"Undeniably, the juror's comments were a breach of the court's [section 1122] admonitions," the Attorney General acknowledges. Not every insignificant infraction of the rules by a juror calls for a new trial, however. "Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507.)

A court should grant a motion for a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged by prejudice that is incurable by admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 573 (*Avila*).) Since the determination whether an incident is incurably prejudicial is intrinsically speculative, a court has considerable discretion in ruling on a motion for mistrial. (*Ibid.*) The standard of review of a court's ruling on a motion for a mistrial is abuse of discretion. (*Ibid.*)

Here, the record shows no abuse of discretion. As the court's interviews with all of the jurors show, some perceptions differed, some recollections diverged, and some jurors might have formed some opinions about the case. Yet the record affirmatively shows that not even one juror had already made up his or her mind about the case. Although "jurors are told not to discuss the case until all the evidence has been presented and instructions given, they are not precluded from thinking about the case, nor would that be humanly possible." (*Wilson, supra,* 44 Cal.4th at p. 840.) [Petitioner] claims that the denial of his motion violated his constitutional rights to an impartial jury and a fair trial, but since the premise of his constitutional claims is that the denial of his motion was prejudicial, his constitutional claims likewise fail. (*People v. Sanders* (1995) 11 Cal.4th 475, 510, fn. 3 (*Sanders*).)

*3. Claim of Juror Intimidation During Deliberations*

[Petitioner] argues that the court's denial of his motions for a mistrial and a new trial on the ground of the presence of police officers in the audience during replays of audio and video exhibits in open court violated his constitutional rights to an impartial jury and a fair trial. The Attorney General argues the contrary.

During deliberations, the jury asked for replays of audio and video exhibits, clarification of instructions, and readback of witness testimony. Noting that "setting up all the equipment" makes a replay "different than a readback," the court had the replays in open court, not in the jury room. The court clarified the instructions in open court, too, but had the court reporter do the readback in the jury room.

After the jury retired to the jury room for readback, the defense objected to replays of the audio and video exhibits of the police pursuit in open court when about 10 police officers, some of whom were victims or witnesses, were in the audience. Analogizing a replay to readback, the defense urged, "This should be done in the jury room," arguing that "police and witnesses are never present during read back" and that a replay in open

court "taints any type of deliberations." The court replied, "It is an open courtroom. This is not testimony," noting that technological difficulties of replays made putting those burdens on a bailiff in the jury room inappropriate. The court noted the importance of counsel being "able to observe what is being observed and how it's being [set] forth. This is a public courtroom nonetheless, and I do not believe there is any legal basis to close the courtroom."

The defense made an oral motion for a mistrial on the basis of a due process violation of the right to an impartial jury. Counsel argued that the prosecutor invited the officers to come to open court during the replays "to prejudice the jury" and pointed out that every juror looked at the officers wearing badges and weapons in open court. In the alternative, the defense requested an admonishment to the jury that the presence of the officers should not taint the deliberations. The court acknowledged "a number of people in the courtroom," some of whom, the defense interjected, were "police officers" and "victims." On the basis of having watched the audience "very carefully," the court noted, the were no "signs, symbols, nonverbal communication, facial expressions by anyone." The prosecution said he invited the officers, who had "every right to be here." The court found no indication of any misbehavior by anyone, declined to "insult any folks that are here" by "admonishing them as to their conduct," and denied the motion.

After the replays in open court, the defense filed a written motion for a mistrial. The court cautioned the jury that "the only evidence you're to consider is what happens from the witness stand or evidence that is put on the record in some fashion during the course of trial." The court added, "What we're doing or people in the audience that may be here throughout, including yesterday, are not to be considered for any purpose." After hearing argument, the court observed that when "these jurors were in this courtroom, they were not deliberating" and that the spectators showed no "intent to influence the jurors in any way" and did nothing to indicate their presence was "other than as members of the public." The court commented, too, that after admonishing the jury the court "made eye contact with each of the 12" jurors in the period of silence that followed and perceived "tacit agreement" with the admonishment. The court denied the motion.

After the jury's verdicts, the defense filed a motion for a new trial on the ground that the court's "allowing the prosecutor to fill the courtroom with police officers during jury deliberations at a time when the jury had presented a question to the court regarding the attempted murder charge" intimidated the jury into returning a guilty verdict on that charge. The prosecutor filed an opposition. After hearing argument, the court denied the motion.

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times. (See U.S. Const., amends. VI, XIV; Cal. Const., art. I, § 15; see also [] § 686, subd. 1.)" (*People v. Woodward* (1992) 4 Cal.4th 376 382 (*Woodward*).) "Given the importance of public trials to both the accused and the public, there is a ""presumption of openness"" in the courtroom that ""may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."" (*People v. Baldwin* (2006) 142 Cal.App.4th 1416,

1421, quoting *Waller v. Georgia* (1984) 467 U.S. 39, 45 (*Waller*).) Public trials not only "provide an opportunity for spectators to observe the judicial system" but also "prompt judges, lawyers, witnesses and jurors to perform their duties more conscientiously." (*Baldwin*, *supra*, at p. 1421.)

Relying primarily on *People v. Feagin* (1995) 34 Cal.App.4th 1427, [Petitioner] argues that proceedings during deliberations are generally outside the scope of the public trial right. The issue in *Feagin* was whether a court denies that right by holding a hearing on juror misconduct in chambers. (*Id.* at p. 1438.) On that issue, *Feagin* held that the presumption of openness was rebutted by showing that the exclusion of the public was necessary to protect the sensitive nature of juror disclosures. (*Id.* at p. 1439.) *Feagin* is inapposite. Citing no persuasive authority and suggesting no plausible justification for excepting the proceedings at issue from the public trial right, [Petitioner] fails to make the requisite showing of a "higher value such as the defendant's right to a fair trial or the government's interest in preserving the confidentiality of the proceedings." (*Ibid.*, citing *Woodward, supra,* 4 Cal.4th at p. 383.) On the record before us, we conclude that the proceedings at issue were within the scope of the public trial right.

The standard for review of a court's ruling on a motion for a mistrial is abuse of discretion (*Avila, supra,* 38 Cal.4th at p. 573), as is the standard for review of a court's ruling on a motion for a new trial (P*eople v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127). Here the record shows no abuse of discretion. The court's thorough observations of the demeanor of the persons in the courtroom during the proceeding at issue refute the entirely speculative nature of [Petitioner's] argument. [Petitioner] contends the denial of his motion violated his constitutional rights to an impartial jury and a fair trial, but since the premise of his constitutional claims is that the denial of his motions was prejudicial, his constitutional claims likewise fail. (*Sanders, supra,* 11 Cal.4th at p. 510, fn. 3.)

(Answer, Ex. A.)

## 2.    Claim Two: Right to an Impartial Jury

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  A defendant is denied a fair trial if even a single juror is prejudiced or biased.  Fields v. Woodford, 281 F.3d 963, 972 (9th Cir. 2002).

A hearing is usually held to determine if a juror has become partial due to circumstances.  See Smith v. Phillips, 455 U.S. 209, 215 (1982) "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Id.  When a trial court finds after a hearing that a juror is not biased, that finding is presumed to be correct.  Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998).

1   Here, providing the state court decision with appropriate deference for each of

2   Petitioner's three contentions regarding juror misconduct, there is at least a possibility

3   that fair-minded jurists could agree with the state court decision that the jurors were

4   impartial and Petitioner was not deprived of his right to a fair trial.

5   Petitioner contends that he was deprived of the right to a fair trial and an impartial

6   jury because the court failed to adequately investigate the possible intimidation of jurors.

7   (Pet. at 15-18.) Petitioner states that "the court should have conducted a detailed inquiry

8   to determine whether any of the other jurors were affected by the two men and the

9   comments made by members of the jury, whether they felt intimidated, and whether they

10  could still be impartial." (Id.) Petitioner further claims that the jury discussion of the two

11  men "was also jury misconduct and a violation of [California] Penal Code section 1122,

12  subdivision (b), to discuss the case." (Id.) However, as the Court of Appeal stated in its

13  reasoned opinion:

> The Attorney General argues that the juror comments at issue here, though a breach of the court's section 1122 admonitions, showed no prejudgment of the case. We agree. "Trivial violations that do not prejudice the parties do not require removal of a sitting juror." (*People v. Wilson* (2008) 44 Cal.4th 758, 839 (*Wilson*).) The comments here neither suggest prejudgment of guilt nor cast doubt on the impartiality of the jurors or the fairness of the trial. Juror comments like those are "'certainly not as serious as questions designed to obtain extrinsic evidence regarding the case itself.'" (*Ibid.*) "No trials are perfect –evidentiary or procedural errors are bound to occur." (*People v. Garcia* (2005) 36 Cal.4th 777, 808 (conc. & dis. opn. of Chin, J.).) [Petitioner] fails to persuade us that the court should have conducted further inquiry.

(Answer, Ex. A.)

21  Petitioner also argues that juror misconduct raises a presumption of prejudice.

22  (Pet. at 18.) However, the Court of Appeal also found that the California Penal Code

23  section 1122 violation of the admonition not to discuss the case did not prejudice the

24  parties. (Answer, Ex. A.) As stated in Bradshaw v. Richey, "a state court's interpretation

25  of state law, including one announced on direct appeal of the challenged conviction,

26  binds a federal court sitting in habeas corpus." 546 U.S. 74, 76 (2005). This Court

27  cannot question the state court's ruling on whether prejudice could be found due to the

1  violation of a state law.

2       Here, the California Court of Appeal found that there was no support in the record

3  for Petitioner's claim that the jury panel had been tainted.  The state appellate court

4  conducted an exhaustive examination of the juror's responses to questions from the trial

5  court regarding being intimidated by observers in the courtroom.  As none of the

6  comments made by juror number 3 gave any reason to suspect that the other jurors

7  (other than juror number 5, who was questioned) were feeling intimidated, there would

8  be no reason to conduct a further inquiry into the partiality of the other jurors. The

9  responses of jurors 3 and 5 indicated that they would reach a decision based solely on

10  the evidence rather than any fears or prejudice; thereby indicating a lack of actual bias.

11  The fundamental and applicable principle here is that due process "means a jury

12  capable and willing to decide the case solely on the evidence before it, and a trial judge

13  ever watchful to prevent prejudicial occurrences and to determine the effect of such

14  occurrences when they happen." Phillips, 455 U.S. at 217. It appears that the trial court

15  undertook appropriate action to ensure that the jury was not swayed by potential

16  intimidation.

17       Petitioner has not presented any evidence to rebut the presumption of

18  correctness attached to the appellate court's finding that there was no jury intimidation.

19  The Court finds the state court's decision, that Petitioner's constitutional right to an

20  impartial jury was not violated by the trial court's refusal to discharge the jury panel, was

21  not "contrary to, nor involved an unreasonable application of, clearly established Federal

22  law, as determined by the Supreme Court of the United States; nor resulted in a decision

23  that was based on an unreasonable determination of the facts in light of the evidence

24  presented in the State court proceeding."  28 U.S.C. § 2254(d).  For these reasons, it is

25  recommended that the claim be denied.

26       3.    Claim Three: Improper Juror Conduct Necessitating Mistrial

27       Petitioner contends that the "jurors were talking about the case…in direct violation

28  of [California] Penal Code section 1122."  (Pet. at 19.)  Petitioner further asserts that

21

1    "some jurors had made up their minds" due to comments like "DNA doesn't lie." (Id.)

2    However, the state court denied this claim in a reasoned decision stating:

3    
4              A court should grant a motion for a mistrial only when a party's chances of
         receiving a fair trial have been irreparably damaged by prejudice that is
5         incurable by admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th
         491, 573 (*Avila*).) Since the determination whether an incident is incurably
6         prejudicial is intrinsically speculative, a court has considerable discretion
         in ruling on a motion for mistrial. (*Ibid.*) The standard of review of a court's
         ruling on a motion for a mistrial is abuse of discretion. (*Ibid.*)

7              Here, the record shows no abuse of discretion. As the court's interviews
8         with all of the jurors show, some perceptions differed, some recollections
         diverged, and some jurors might have formed some opinions about the
9         case. Yet the record affirmatively shows that not even one juror had
         already made up his or her mind about the case. Although "jurors are told
10        not to discuss the case until all the evidence has been presented and
         instructions given, they are not precluded from thinking about the case,
11        nor would that be humanly possible." (*Wilson, supra,* 44 Cal.4th at p. 840.)
         [Petitioner] claims that the denial of his motion violated his constitutional
12        rights to an impartial jury and a fair trial, but since the premise of his
         constitutional claims is that the denial of his motion was prejudicial, his
13        constitutional claims likewise fail. (*People v. Sanders* (1995) 11 Cal.4th
         475, 510, fn. 3 (*Sanders*).)

14   (Answer, Ex. A.)

15        This Court cannot review a state court's application of the standard for granting a

16   mistrial as that is a question of state law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

17   Petitioner's underlying claim that some or all of the jurors had prejudged the case was

18   also denied by the Court of Appeal. As stated above, the jurors were interviewed

19   individually and affirmatively stated that they had not made up their minds as to a

20   guilty/not guilty verdict. (Answer, Ex. A at 7.) Unconstitutional prejudgment only occurs

21   if one of the jurors would not render a verdict based on all of the evidence presented.

22   Davis v. Woodford, 384 F.3d 628, 653 (9th Cir. 2004). On the word of the jurors, the

23   state court made the reasonable determination that the jurors had not foreclosed their

24   opinions and would hear all of the evidence presented. Fairminded jurists could agree

25   with this state court decision, and Petitioner is therefore not entitled to relief with regard

26   to this claim.

27              4.      Claim Four: Intimidation by the Presence of Police Officers

28

Petitioner contends that he was deprived of his right to a fair trial and an impartial jury due to the presence of police officers in the courtroom while the jury was deliberating and watching video exhibits.  (Pet. at 21-25.)  Petitioner states "10 to 15 police officers were in the courtroom" who "were undoubtedly sending the message that they wanted convictions."  (Id. at 23.)  Petitioner also points to two aggravating factors, "the display and resultant message were made during deliberations… [and] it was a deliberate attempt by the prosecution to affect the verdicts."  (Id.)  As evidence of the second factor, Petitioner asserts that the prosecutor called at least one of the officers and asked him to be present during the showing of the video.  (Id. at 25.)

To the extent that Petitioner challenges claims of state law, again, this Court cannot disturb such decisions on habeas review.  Bradshaw v. Richey, 546 U.S. at 76.  However, the Court shall determine whether underlying prejudice, which may have resulted from the presence of police spectators, violated Petitioner's federal rights.

As previously stated, in order for a state decision to be an unreasonable application of federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  In this case, as Respondent points out, there is no governing legal principle as to spectator conduct.  (Answer at 28-29.)

> In contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of the spectator conduct…is an open question in our jurisprudence. This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial.

Carey v. Musladin, 549 U.S. 70, 76 (2006).

As such, the state court's decision as to the police presence was not an unreasonable application of any principle previously established by the Supreme Court.  Fair minded jurists could agree with the correctness of the state court decision that the presence of the police officers during deliberation did not create a partial jury or deprive Petitioner of his right to a fair trial.  Petitioner is therefore not entitled to relief with regard to this claim.

1   **IV.   <u>RECOMMENDATION</u>**

2         Accordingly, it is hereby recommended that the petition for a writ of habeas

3   corpus be DENIED with prejudice.

4         This Findings and Recommendation is submitted to the assigned District Judge,

5   pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after

6   being served with the Findings and Recommendation, any party may file written

7   objections with the Court and serve a copy on all parties.  Such a document should be

8   captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply

9   to the objections shall be served and filed within fourteen (14) days after service of the

10  objections.  The parties are advised that failure to file objections within the specified time

11  may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d

12  834, 839 (9th Cir. 2014).

13
14  IT IS SO ORDERED.

15    Dated:   <u>April 29, 2015</u>            <u>/s/ *Michael J. Seng*</u>

16                                        UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28